# N. Y. SUPERIOR COURT.

In the matter of CARL VOGT a petitioner for a discharge under a writ of habeas corpus from a warrant of the governor surrendering him to the Belgian government.

The law of this State passed in 1822, providing that the governor may in his discretion, deliver over to justice any person found within the State who shall be charged with having committed *without the jurisdiction of the United States,* any crime except treason, which by the laws of this State, if committed therein, is punishable by death or by imprisonment in the state's prison, is *unconstitutional and void*

The petitioner, it appeared was in custody under a warrant issued by the governor of this State, at the request of the Belgian minister committing him, for surrender to the authorities of that government, as a person charged with having committed murder, arson and robbery in Belgium. It also appeared that he was held under a commitment to answer an indictment for grand larceny.

No provision by *treaty* for the extradition of persons charged with crimes, exists between the United States and Belgium.

*Held,* that the warrant for the surrender of the petitioner to the Belgium authorities is unconstitutional and void, and insufficient for his detention.

But the commitment upon the indictment for grand larceny. being under a statute of the State, for bringing stolen goods into this State, his discharge was refused.

HABEAS CORPUS.
*Before* WILLIAM E. CURTIS, *Justice.*

BY the return to a writ of habeas corpus issued, upon the petition of one Carl Vogt to the warden of the city prison, it appears that he is in custody under a warrant issued by the governor of the State of New York, at the request of the Belgian minister, committing him for surrender to the authorities of that government as a person charged with having committed murder, arson and robbery in Belgium. It also appears that he is held under a commitment to answer an indictment for grand larceny. No provision by treaty for the extradition of persons charged with crimes, exists between

the United States and Belgium. The questions arising as to the legal effect of the warrant of the governor, were the only ones presented to the consideration of the court.

JOHN H. ANTHON, *for the prisoner.*
A. S. SULLIVAN *and* F. R. COUDERT, *opposed.*

WM. E. CURTIS, *J.*—The State law enacted in 1822, provides that the governor may in his discretion, deliver over to justice any person found within the state, who shall be charged with having committed, *without the jurisdiction of the United States*, any crime except treason, which by the laws of this state, if committed therein, is punishable by death or by imprisonment in the state's prison. (1 *R. S.* 164). It is claimed on behalf of the prisoner, that the power attempted to be conferred by this provision of the state law on the governor conflicts with the constitution of the United States, and is without force and effect.

The constitution of the United States provides that " no state shall enter into any treaty, alliance or confederation "; also that no state shall without the consent of congress, enter into any agreement or contract with another state, or with a foreign power.

These constitutional provisions have been regarded as of such force, that during the half century that has elasped since the passage of the state law, I am not aware that a governor of this state has surrendered under its provisions, any person to a foreign government. It has been considered that the national government had exclusive jurisdiction over the subject, and that the act of the legislature was unconstitutional and void. It may well be doubted whether the framers of the national constitution intended that a citizen, or a person casually domiciled in a state, when charged with a crime in a foreign country, should be liable without a hearing before a judicial officer, to be surrendered at the discretion of one man to any power, European or Asiatic, as a

criminal for judgment or punishment. It could hardly have been so left, intentionally, that a citizen on such a charge, could be placed without the protection of our courts and judicial officers, and surrendered to the authorities of a foreign country at the will of the governor of a state.

The eminent chancellor KENT, and who, the learned counsel for the Belgian government frankly avows, is the only authority he has been able to find bearing directly on the statute, following the views of Grotius, Vattel and other distinguished public jurists, as to what comity between states and nations requires, fully sustains the justice, wisdom and constitutionality of the statute. (*Kent's Com., vol.* 1, 37, 38 *and note.*) But our ancestors centuries ago, strangers to the refinements of the civil law, sturdily wrung from the crown, the provision in the great charter " that no freeman shall be imprisoned, unless by the judgment of his peers, or by the law of the land." This provision is still guaranteed to us by the national and state constitutions. In the light of these events, and in a freer atmosphere, the common law jurists in distinction from those of the civil law, have treated the right of personal liberty as a right to be most sacredly guarded. It should be jealously watched and never encroached upon by either nation or state.

The constitution of the United States regarded the substance of things and not forms, and it is difficult to find in that brief instrument a superfluous word, or one without a distinct meaning. When it declares that no state shall without the consent of congress enter into agreement or compact with a foreign power, it prohibits any arrangement by which at the request of a foreign power, a state can deliver up a person charged with a crime to such foreign power. The request of the minister, is the request of the foreign power he represents, and the acceding to it on the part of the state, acting through its agent the governor, constitutes an agreement between the state and the foreign power, precisely such as the constitution of the United States prohibits by

the use of the words "agreement or compact" thereby meaning any arrangement between the two not embraced by the terms "treaty, alliance or confederation" previously therein forbidden.

The existence of such a power by a state is also inconsistent, and at variance with the powers conferred on the federal government. It would prejudice the treaty making power and the power to entertain diplomatic relations solely conferred upon the latter. There could be no useful concurrent exercise of these powers, but on the contrary when the individual states entertain the requests and enter into arrangements with the ministers of foreign powers, a labarynth of confusion and disasters is opened. It was doubtless to avoid this, that all relations between the several states and foreign governments, were so carefully watched and restricted by the constitution at the very formation of the government.

While there may be times when the exercise of such a power by the various states would lead to great acts of individual oppressions, especially during periods of political commotions and changes in Europe, there would necessarily arise, growing out of them, many difficult and embarrassing questions affecting the powers conferred on the general government and its relations with foreign governments, and which the former should alone determine.

Though no judgment was given in the case of *Holmes* agt. *Jamison et al*, (14 *Peters R.*, 540,) these views are sustained in the opinion delivered by Chief Justice TANEY and concurred in by Judges STORY, McLEAN and WAYNE, though not by some of the other judges. This was a case where the governor of Vermont granted a warrant for the surrender of an alleged criminal to the Canadian authorities, and it appears that the judges of the supreme court of judicature of Vermont, after an examination of the opinions delivered by the judges of the supreme court of the United States, became satisfied that the power claimed to deliver up the prisoner did not exist. (12 *Vermont R.*, 636.)

It is to be regretted that this country should be the refuge of a criminal from any nationality.  Treaties with provisions for the extradition of persons charged with crime after an examination before a judicial officer, exist between the general government and many foreign states.  It is difficult to conceive why such an arrangement does not exist with a government like Belgium, whose liberal legislation and enlightened administration of justice is reflected in its marked developments of material prosperity.  It is true that the states may, as a part of their ordinary police powers reserved to them, remove any person guilty or charged with crimes, but it is to be observed that in this the states act simply with a view to their own protection and welfare, and totally irrespective of the foreign governments in which the crimes were committed (*N. York* agt. *Milne,* 11 *Peters,* 102).  In this contingency the person removed may still assert before our courts any rights that have been infringed upon, but when delivered over to a foreign power he may be deprived of all redress, however wronged by the act of surrender.

I am thus led to the conclusion that the warrant for the surrender of the prisoner to the Belgian authorities is unconstitutional and void, and is of insufficient authority for his detention and imprisonment by the warden of the city prison.

But it appears that he is also imprisoned on a commitment upon an indictment for grand larceny, under a statute of the state, for bringing stolen goods into this state, concerning the regularity of which no question is raised, and I decline to order his discharge from custody thereunder.

The prisoner must be remanded into custody, to be held under the commitment.

Affirmed at general term by the court of appeals, November, 1872.